**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**CHARLES W. LAHEY**
South Bend, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RICHARD C. WEBSTER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ANDRE L. GARRETT, | ) | |
| | ) | |
| Appellant-Petitioner, | ) | |
| | ) | |
| vs. | ) | No. 71A03-1305-PC-199 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Respondent. | ) | |

APPEAL FROM THE ST. JOSEPH SUPERIOR COURT
The Honorable John M. Marnocha, Judge
Cause No. 71D02-0402-MR-6

**February 20, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

STATEMENT OF THE CASE

Appellant-Petitioner, Andre L. Garrett (Garrett), appeals the post-conviction court's denial of his petition for post-conviction relief.

We affirm.

ISSUES

Garrett raises two issues on appeal, which we restate as:

(1) Whether the post-conviction court abused its discretion by limiting the issues Garrett was allowed to present at the post-conviction hearing; and

(2) Whether the post-conviction court abused its discretion when it concluded that the recantation of a witness' trial testimony was merely impeaching.

FACTS AND PROCEDURAL HISTORY

We adopt the recitation of facts as stated in *Garrett v. State*, No. 71A03-0410-CR-474 (Ind. Ct. App. Aug. 19, 2005):

> On December 30, 2002, Cedric Steele, who was known as "Radio," decided to drive from Chicago to South Bend to collect $200.00 from Wilbur Crawford for the sale of a washer and dryer. Garrett, who is referred to in the record as "Bo," "Heavy," or "Dre," accompanied Steele. When Garrett and Steele arrived in South Bend, they drove to the residence of Everett Carver, otherwise known as "Forty." Carver was going to direct Steele to Crawford's house. Carver told Steele that Christopher Barbour, otherwise known as "Ash," was in town. The men decided to visit Barbour.
>
> Steele, Garrett and Carver drove to Indiana Arms and Ammunition where Steele purchased some ammunition. They then went to Barbour's house to see if he would accompany them to Crawford's house. Barbour said he would in a little while, and Steele, Garrett and Carver drove to a restaurant, ate, and retuned to Barbour's house. All four men drove to Crawford's house, where Crawford paid Steele the $200.00. The men smoked some marijuana and drank some alcohol. While there, Barbour got

2

a telephone call from James Phillips, also known as "J.R.," who wanted to purchase marijuana from Barbour.

The men went back to Barbour's residence where he retrieved some marijuana. Barbour directed Steele to Phillips' residence, and Steele, Garrett and Carver sat in the car while Barbour conducted his business. The men then left, drove around, and purchased some cigarettes at a gas station. While at the gas station, Barbour received another call from Phillips asking for more marijuana. Barbour agreed to trade marijuana for cocaine.

Steele, Carver and Garrett started questioning Barbour about Phillips. Carver said he has seen Phillips with a lot of money, and at Christmas he saw Phillips spend thousands of dollars at a mall. The men decided to rob Phillips, but Barbour told them to wait until he had completed the trade.

Phillips and Barbour agreed to meet outside the residence of Dorcas Brown on O'Brien Street. Steele drove to Brown's house and Barbour told them Phillips would be there soon. Barbour said he would call them when the trade had been completed so they could rob Phillips. Steele, Carver and Garrett drove down the street and parked while Barbour entered Brown's home though the window. Steele and Garrett retrieved guns from the trunk and waited for Barbour's telephone call.

Barbour discovered Brown's mother and another man in the house smoking marijuana and drinking alcohol. He retrieved some marijuana from the attic, and Bryant Kinds knocked on the door of the Brown house. Barbour told Brown's mother not to answer the door. Phillips drove up while Kinds was on the front porch, and Kinds walked to his car and talked to him. Kinds then walked away.

Steele, Carver and Garrett saw Phillips' car, and started walking toward where the car was parked. Garrett was wearing a black hooded sweatshirt and a black skullcap. He carried a revolver. Carver wore a red hooded sweatshirt and Steele wore a red jacket. Garrett approached the driver's side of Phillips' car, said "punk bitch," and fired his gun into the window. Phillips' car went backward, ran over a fire hydrant, struck the side of a church and finally came to a stop.

The men scattered. Steele returned to his car and drove away. Garrett flagged him down a couple of streets away, and as they were driving back to Chicago he told Steele he had shot Phillips in the arm.

Phillips died from bullet wounds in his left chest and left back, one of which [] pierced his heart. Both bullets were .44 caliber and fired from the same gun.

While in jail, Garrett told Anthony Pack he was upset about Barbour snitching on him. When Pack asked Garrett about [t]hat, Garrett replied, "you know, about when I shot J.R."

On February 3, 2004, the State filed an Information charging Garrett with Count I, murder, a felony; Count II, attempted robbery, a Class B felony; and Count III, felony murder, a felony. On September 2, 2004, following a jury trial, Garrett was found guilty as charged. On October 1, 2004, the trial court conducted a sentencing hearing and sentenced Garrett to sixty years on Count I, and fifteen years on Count II, with sentences to run concurrently. The trial court vacated Garrett's conviction on Count III. Garrett appealed his conviction, which we affirmed on August 19, 2005.

On August 1, 2006, Garrett filed his petition for post-conviction relief. On January 7, 2013, the post-conviction court conducted a hearing on Garrett's petition, which it subsequently denied on May 31, 2013.

Garrett now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

I. *Standard of Review*

Under the rules of post-conviction relief, the petitioner must establish the grounds for relief by a preponderance of the evidence. Ind. Post-Conviction Rule 1, § 5; *Strowmatt v. State*, 779 N.E.2d 971, 974-75 (Ind. Ct. App. 2002). The purpose of post-conviction relief is not to provide a substitute for direct appeal, but to provide a means for

raising issues not known or available to the defendant at the time of the original appeal. *Id*. If an issue was available on direct appeal but not litigated, it is waived. *Id*.

## II. *Limitation of Issues*

Garrett contends that the post-conviction court abused its discretion by improperly limiting the issues his counsel was allowed to present during the hearing. At the commencement of the hearing, Garrett summarized the issues he proposed to present, the witnesses he intended to call, and the evidence he would introduce. The State objected, as "the only [issues] claimed in the petition for post-conviction relief, were ineffective assistance of trial counsel and ineffective assistance of appellate counsel." (PCR Transcript pp. 7-8). The State requested that any evidence and witnesses presented would be limited to those two issues because the State had relied on Garrett's petition in preparing for the hearing. Because the post-conviction court opined that issues "as to the nature of the lineups and what was introduced at trial and what people looked like or didn't look like, was a matter for the jury to determine and was a matter brought up on direct appeal," the court limited the proceedings to "the effect of [Steele's] recantation of his trial testimony" and the "ineffective assistance of counsel, in that alibi information was given to the lead trial counsel in this case." (PCR Tr. p. 9). Garrett now maintains that the post-conviction court's curtailing of his issues was improper.

First, it should be noted that Garrett did not object at the hearing to what he now characterizes the unfair limitation of his presentation of evidence. A court has broad discretion in ruling on the admission or exclusion of evidence. *Griffith v. State*, 898 N.E.2d 412, 415 (Ind. Ct. App. 2008). However "[e]rror may not be predicated upon a

5

ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one excluding evidence, the substance of the evidence was made known to the court by a proper offer of proof, or was apparent from the context within which questions were asked." Ind. Evidence Rule 103. Thus, in order to preserve the exclusion of evidence for appellate review, a defendant must make an offer of proof, setting forth the grounds for admission of the evidence and the relevance of the testimony. *Fowler v. State*, 929 N.E.2d 875, 881 (Ind. Ct. App. 2008).

Aside from a summation of what evidence and witnesses he intended to present at the beginning of the hearing, Garrett did not make an offer of proof after the post-conviction court limited the issues. Therefore, Garrett has failed to preserve the error for our review. Moreover, based on our review of the record and despite the post-conviction court's ruling, Garrett called all the witnesses he intended to call and presented the evidence he intended to present. As such, we cannot conclude that Garret was prejudiced, let alone, that an error was made.

## II. *Recantation of Trial Testimony*

Next, Garrett asserts that the post-conviction court erred in characterizing Cedric Steele's video deposition as impeachment evidence; rather, he claims that "[w]hat Steele did was to 'recant' his trial testimony, a more descriptive term of art for this particular set of facts[.]" (Appellant's Br. p. 9).

During the post-conviction proceedings, Garrett introduced a video deposition of Steele who claimed that he had falsely identified Garrett at trial as the person who pulled the trigger and murdered James Phillips. Steele explained that it was another Bo who did

6

the shooting and that he had chosen Garrett's photograph from the photographic array because his photo most closely resembled the real Bo. Treating the video deposition as newly discovered evidence, the post-conviction court concluded

> This court finds [Steele's] deposition testimony to be dubious at best and bordering on incredible. The court places no weight on [Steele's] recantation and finds that it is merely impeaching of his trial testimony. Accordingly, [G]arrett has not satisfied the requirements of [newly discovered evidence] and is not entitled to a new trial on this claim.

(Appellant's App. p. 29).

In *Carter v. State*, 738 N.E.2d 665, 671 (Ind. 2000), our supreme court enunciated the nine criteria for admission of newly-discovered evidence:

> New evidence will mandate a new trial only when the defendant demonstrates that (1) the evidence has been discovered since the trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for trial; (7) the evidence is worthy of credit; (8) it can be produced upon a retrial of the case; and (9) it will probably produce a different result at retrial.

We analyze these nine factors with care, as "the basis for newly discovered evidence should be received with great caution and the alleged new evidence carefully scrutinized." *Id.* On appeal, the denial of a petition predicated on newly discovered evidence is considered a discretionary ruling and is reviewed deferentially. *Dickens v. State*, 997 N.E.2d 56, 60-61 (Ind. Ct. App. 2013). The burden of showing that all nine requirements are met rests with the petitioner for post-conviction relief. *Id.* at 61.

Garrett has not shown that Steele's 'recantation' meets all the criteria. BLACK'S LAW DICTIONARY 768 (8th ed. 2004) (emphasis added) defines impeachment as "[t]he act of discrediting a witness, as *by catching the witness in a lie* or by demonstrating that the

7

witness has been convicted of a criminal offense."  As Steele's 'recantation' establishes that his testimony at trial was untrue, and he thus was caught in a lie, we fail to see how using Steele's video testimony at a new trial would not be mere impeachment.  Therefore, we affirm the post-conviction court's denial of Garrett's petition.

CONCLUSION

Based on the foregoing, we conclude that the post-conviction court properly denied Garrett's petition for post-conviction relief.

Affirmed.

VAIDIK, C.J. and MAY, J. concur